1

2

3                         UNITED STATES DISTRICT COURT

4                        NORTHERN DISTRICT OF CALIFORNIA

5

6    B.D.,                                    Case No.  21-cv-04493-JCS

7                    Plaintiff,

8          v.                                 **ORDER REGARDING CROSS
                                              MOTIONS FOR SUMMARY
                                              JUDGMENT**
9    KILOLO KIJAKAZI,
                                              Re: Dkt. Nos. 21, 29
10                  Defendant.

11   **I.      INTRODUCTION**

12         Plaintiff B.D.[1] moves for summary judgment on her claim that Defendant Kilolo Kijakazi,

13   Acting Commissioner of Social Security (the "Commissioner"),[2] erred in denying B.D.'s

14   application for disability benefits.  The Commissioner filed a cross-motion for summary judgment

15   seeking to affirm that decision.  For the reasons discussed below, B.D.'s motion is GRANTED,

16   the Commissioner's motion is DENIED, and the case is REMANDED for further administrative

17   proceedings.[3]

18   **II.     BACKGROUND**

19         **A.      Five Step Framework for ALJ Decisions**

20         When a claimant alleges a disability and applies for Social Security benefits, the ALJ

21   evaluates their claim using a five-step process.  20 C.F.R. § 404.1520(a)(4).  At step one, if the

22   claimant has engaged in "substantial gainful activity" during the alleged period of disability, they

23

24   [1] Because opinions by the Court are more widely available than other filings, and this order
     contains potentially sensitive medical information, this order refers to the plaintiff only by her
25   initials.  This order does not alter the degree of public access to other filings in this action
     provided by Rule 5.2(c) of the Federal Rules of Civil Procedure and Civil Local Rule
26   5-1(c)(5)(B)(i).
     [2] Kijakazi became Acting Commissioner while this case was pending, replacing former
27   Commissioner Andrew Saul, and is therefore automatically substituted as the defendant under
     Rule 25(d) of the Federal Rules of Civil Procedure.
28   [3] The parties have consented to the jurisdiction of a magistrate judge for all purposes pursuant to
     28 U.S.C. § 636(c).

1   are not disabled.  20 C.F.R. § 404.1520(a)(4)(i).  Substantial gainful activity is "work activity that

2   involves doing significant physical or mental activities . . . for pay or profit."  20 C.F.R.

3   § 220.141(a)–(b).  If the claimant has not engaged in such activities, the evaluation continues at

4   step two.

5           At the second step of the analysis, if the claimant has no "severe medically determinable

6   impairment," they are not disabled.  20 C.F.R. § 404.1520(a)(4)(ii).  Impairments are severe when

7   there is "more than a minimal limitation in [the claimant's] ability to do basic work activities."  20

8   C.F.R. § 404.1520(c).  If the claimant does not suffer from a severe impairment, they are not

9   disabled; if they have a severe impairment, the evaluation continues to step three.

10          Next, the ALJ turns to the Social Security Administration's listings of severe impairments.

11  *See* 20 C.F.R. § 404, subpt. P, app. 1.  If the claimant's impairment meets or medically equals the

12  definition of a listed impairment, the claimant is disabled.  20 C.F.R. § 404.1520(a)(4)(iii).  If not,

13  the evaluation proceeds to step four.

14          At step four, if—based on the claimant's residual functional capacity ("RFC")—the

15  claimant can still perform their past work, they are not disabled.  20 C.F.R. § 404.1520(a)(4)(iv).

16  The RFC is a determination of "the most [the claimant] can do despite [the claimant's]

17  limitations."  20 C.F.R. § 404.1520(a)(1).  If the ALJ finds that the claimant can perform their past

18  relevant work, they are not disabled; if they are not able to perform such work, the evaluation

19  moves to step five.

20          For the fifth and final step, the burden shifts from the claimant to prove disability to the

21  Commissioner to "identify specific jobs existing in substantial numbers in the national economy

22  that the claimant can perform despite [his] identified limitations."  *Meanel v. Apfel*, 172 F.3d

23  1111, 1114 (9th Cir. 1999) (citing *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995)).  If the

24  Commissioner can identify work that the claimant could perform, they are not disabled; if not, the

25  claimant is disabled and entitled to benefits.  20 C.F.R. § 404.1520(g)(1).

26          **B.     The ALJ's Decision and Underlying Evidence**

27          This case presents a complex medical and procedural history.  The first ALJ to consider

28  B.D.'s application, Arthur Zeidman, twice found B.D. not disabled and was twice reversed by the

2

United States District Court
Northern District of California

1    Social Security Administration's Appeals Council, which ultimately reassigned the case to a

2    different ALJ, David LaBarre.  *See* Admin. Record ("AR," dkt. 16) at 269–70, 317–19.  In the

3    decision at issue here, ALJ LaBarre assessed B.D.'s severe impairments as including "obesity;

4    substance-induced affective mood disorder; cannabis abuse; depression; anxiety; post-traumatic

5    stress disorder ('PTSD'); migraine with aura; obstructive sleep apnea; pelvic organ prolapse;

6    degenerative joint disease of the right hip; and calcific tendinosis of the left hip."  *Id.* at 19.  He

7    rejected as severe impairments endometriosis, polycystic ovary syndrome, a hormonal disorder,

8    back and spine issues, fibromyalgia, cellulitis, fatty liver, gastroesophageal reflux disease, asthma,

9    traumatic brain injury, HPV with abnormal cervical cells, borderline personality disorder, and

10   somatization disorder.  *Id.* at 19–21.  B.D. disputes the omission of some of those disorders from

11   the list of severe impairments.

12        The ALJ determined that B.D.'s severe impairments did not meet or equal the severity of a

13   listed impairment.  *Id.* at 22.  He assessed the following RFC for B.D. when taking into account

14   her substance use:

> [T]he claimant has the residual functional capacity to perform
> sedentary work as defined in 20 CFR 416.967(a) except: the claimant
> is limited to lifting and/or carrying 10 pounds occasionally and 5
> pounds frequently; she can sit for 6 hours in an 8-hour workday; she
> can stand and/or walk for 2 hours in an 8-hour workday; she would
> require a cane for all ambulation; she is limited to occasional climbing
> of ramps and stairs, and never climbing of ladders, ropes, and
> scaffolds; she is limited to occasional stooping, kneeling, crouching,
> and crawling; she is able to perform low stress work, which is defined
> as understanding, remembering, and carrying out instructions and
> work consistent with simple, routine, and repetitive tasks; she is able
> to perform work involving judgment required for making simple
> work-related decisions; she is limited to occasional interaction with
> co-workers and the general public; she cannot perform fast-paced
> work, such as assembly line work; she would be off-task for 10% of
> an 8-hour workday; and she would have two unexpected absences a
> month.

24   *Id.* at 25.

25        The ALJ determined that B.D. had no past relevant work, and no jobs existed in significant

26   numbers that she could perform with the RFC that accounted for her substance use.  *Id.* at 33.  If

27   B.D. ceased substance use, however, the ALJ determined that the limitations of being off task for

28   ten percent of the workday and having two unexpected absences per month would no longer apply,

United States District Court
Northern District of California

1    and that a significant number of jobs were available that she would be able to perform with the

2    remainder of her RFC, which would otherwise be substantially unchanged.  *Id.* at 35–37.

3          Despite the complexity of the case as a whole, one error by the ALJ is relatively

4    straightforward and potentially dispositive of B.D.'s application for disability benefits: the ALJ's

5    conclusion at the final analytical step that although B.D.'s medically determinable limitations

6    would currently preclude all employment, she would be able to work if not for her use of cannabis

7    and opiates, and thus is not disabled.  This order therefore focuses on the evidence and arguments

8    relevant to that issue, and does not reach or discuss in any detail the myriad other issues in the

9    case.

10         B.D.'s primary care physician Dr. Lisa Quinones reported on October 7, 2020 that, among

11    other limitations, B.D. would need to miss two days of work per month to attend appointments

12    with Dr. Quinones's clinic, and that B.D. would be off task for thirty minutes per workday due to

13    psychiatric symptoms.  AR at 4396.  The ALJ rejected most of Dr. Quinones's opinions but

14    accepted that B.D. would miss two days of work per month to attend medical appointments as a

15    function of seeking opiates.  *Id.* at 31–32.  (Dr. Quinones had not attributed those absences to

16    seeking narcotics, instead reporting that B.D. did not abuse drugs or alcohol.  *Id.* at 4396.)   The

17    ALJ appears to have derived his conclusion that B.D. would be off task for a portion of the day

18    from Dr. Quinones's report as well, although he does not explain how he determined that B.D

19    would be off task for ten percent of the day rather than the thirty minutes reported by Dr.

20    Quinones.  *Id.* at 32.

21         ALJ LaBarre relied on testimony that Dr. Miriam Sherman, MD[4] offered at a 2019 hearing

22    before ALJ Zeidman to conclude that B.D.'s substance use was material to the determination of

23    disability:

24          Dr. M. Sherman substantially testified that the claimant's functioning
            would improve in the absence of substance use. In her testimony, she
25          described hyperalgesia (enhanced pain sensitivity) as a side effect of
            the claimant's long term opiate use. She also described the claimant's
26

27    _____
      [4] Dr. Miriam Sherman's husband Dr. Lawrence Sherman also provided evidence in this case.  *See*
28    AR at 151.  This order distinguishes those doctors on subsequent references by including their first
      initials.

United States District Court
Northern District of California

1

2

3

4

> marijuana and opiate use increasing the claimant's depression and anxiety symptoms. She also provided a functional evaluation that in the absence of substance use, the claimant would be capable of simple, routine tasks. These specific findings receive significant weight, as they are consistent with the claimant's resistance when providers try to decrease her narcotic use, and her CURES report showing her attempts to obtain narcotics from multiple providers . . . .

5

*Id.* at 35.  The ALJ considered Dr. M. Sherman's opinions to be also consistent with relatively

6

normal findings on mental status examinations and with B.D.'s reported daily activities.  *Id.* at 35.

7

While Dr. M. Sherman reviewed the record available at the time of her testimony, she does not

8

appear to have treated or examined B.D.

9

Dr. M. Sherman's testimony included the following relevant passages addressing

10

substance use.  Although the excerpts below are lengthy, the Court finds them highly relevant to

11

understanding the nature of Dr. M. Sherman's testimony and her treatment of B.D.'s substance

12

use.

13

14

15

16

17

18

> A. . . . I'd like to begin by stating, once again, that substances are certainly material in this situation. Those substances as mentioned before are opiates and marijuana. The references for that are many when [sic] a couple of urine -- positive urinary drug screens, the latest of which is 2016, 34F/196 that was positive for opiates and marijuana. Other exhibits showing essentially the same thing are 23F/4, 2014, 22F/69, of course, in 2015. The substance was Norco in that case. And 2014, 14F/17, positive for cannabis also. So that we know that marijuana has been abused, probably through 2016, and opiates are still being used now.

19

20

21

22

23

> I'd like to mention that this claimant has been from 2011 seeking opiates. Once we start by looking at the exhibits list and one wonders initially, without even opening any of the exhibits, there were -- the claimant sought treatment at multiple institutions. And if one reads the exhibits, one can see that her goal really was the seeking of opiates. Just a couple of citations. 27F/25, that I think was mentioned already, multiple primary care doctors. And it's reported in that exhibit that when they tell her they will no longer prescribe opiates, she leaves them and seeks another primary care doctor.

24

25

> 3 -- 38F/14, in 2017, an interesting quote by the claimant herself -- I'm sorry, by the doctor who saw her -- quote, doesn't like going to the ER because they keep track of my pain medication, end quote.

26

27

> Another interesting exhibit from an ER is . . . 3F/21. May have strong personality component to her symptoms. Difficult to discern what is true and is not true. So with . . . that prelude, I can tell you what her impairments are.

28

> Q. Okay.

United States District Court
Northern District of California

1
2
3
4

A. Let's start with the major one. Somatization disorder. Chronic pain, 38F/14 in 2017. 30F/5 in 2016. 17/F15, 15F/16 in 2014. So again, . . . coming to the doctors in the ER and to other doctors with complaints of chronic pain, and one wonders if the . . . problems are, as was mentioned by her psychiatrist Dr. Lively, if it's a desire for attention or -- and/or opiate seeking.

5
6

One also wonders if she has increased pain secondary to opiates and marijuana because it's certainly true that a side effect of opiates is hyperalgesia, that is, whatever pain one has is made worse with opiates unless, lastly, one wonders about malingering.

7
8

Malingering, by the way, is a falsified or exaggerated behavior . . . for a goal. And for many of the exhibits, that goal is obtaining opiates.

9
10

In addition to somatization disorder, 12.08 is another category of personality disorder. 15F/5 in 2013, a diagnosis was made of cluster B characteristics, and that usually means borderline personality or antisocial personality disorder.

11
12
13
14
15

Let's go to the next one. 12.04, described as the process disorder, NOS at 15F/5, 2013 or dysthymic disorder in 15F/16, also described as major depressive disorder, 2F/1 in 2011. One has to add since opiates are on board in all of those -- at all of those times, one has to make a diagnosis also of substance-induced mood disorder because a side effect of opiates is . . . increased depression. And the same is true for marijuana. Marijuana side effect is depression, increased depression, and anxiety.

16
17

That leads us to the last category. 12.06, anxiety disorder, NOS, mentioned in 13F/2, 2014. And one has to add for the same reason, substance-induced anxiety disorder. Marijuana and opiates does increase anxiety.

18

So, Your Honor . . . those are the categories of impairments.

19

AR at 151–54.

20
21
22

A. . . . . [W]ith the seeking of opiates that's certainly continuous in this record, yes, the B criteria leads to limitations that really would not enable her to work. However, without the use of marijuana and without the seeking of opiates, the B criteria are different. . . .

23
24

Q. All right. So let me divide this up as you presented it. With the opiate-seeking behavior, let's go through the B criteria based on . . . that behavior.

25
26
27
28

A. Okay. Understanding, remembering, or applying information, no limitation. Interacting with others, marked limitation because the opiates lead to impulsivity and angry outbursts. So interacting with others, again, is marked. Concentration puts us in pace, moderate, leading to decreased concentration based on the opiates and the marijuana and certainly seeking of opiates. At a patient [sic] or managing one's self, one has to say marked. So with the . . . seeking of opiates and the chronic use of opiates, this woman cannot -- would

6

1    not be able to work.

2    Q. Okay. And then without the issue of substances, how would the B
     criteria vary?

3    A. Okay. Understanding, remembering, and applying information,
4    none. Interacting with others, moderate. Concentration, persistence,
     or pace, moderate based on her concerns, her somatic concerns. At a
5    patient [sic] or managing one's self, one would have to say mild. So
     without the opiate seeking and without the opiates, she could do
6    simple repetitive tasks and more complex tasks, mostly non-public.

7    I made a mistake in my report. Concentration, persistence or pace
     without the drugs, mild.

8    *Id.* at 155.

9    When asked later by B.D.'s attorney about a diagnosis of somatization disorder and what

10   "paragraph A" criteria B.D. lacked,[5] Dr. M. Sherman testified:

11   A. Okay. I think what is really not present, although we[6] . . . certainly
     have said that in the area of -- in the listings or in the categories we
12   ascribe somatization disorder to this claimant. We wonder if actually
     -- and I certainly wonder -- and probably in reading the whole . . .
13   report, I believe she's malingering. And that means she's
     exaggerating her symptoms and/or she's . . . not truthful regarding her
14   symptoms. So in reality, I don't think she meets any of the criteria of
     somatization. It sounds as though she's . . . complaining of great pain
15   and really that the . . category of somatization is really not . . . the
     case.
16
     [. . .]
17
     A. However, because she is . . . seeking opiates, that's why one says
18

19   _____
     [5] "Somatic symptom and related disorders . . . are characterized by physical symptoms or deficits
20   that are not intentionally produced or feigned, and that, following clinical investigation, cannot be
     fully explained by a general medical condition, another mental disorder, the direct effects of a
21   substance, or a culturally sanctioned behavior or experience. These disorders may also be
     characterized by a preoccupation with having or acquiring a serious medical condition that has not
22   been identified or diagnosed. Symptoms and signs may include, but are not limited to, pain and
     other abnormalities of sensation, gastrointestinal symptoms, fatigue, a high level of anxiety about
23   personal health status, abnormal motor movement, pseudoseizures, and pseudoneurological
     symptoms, such as blindness or deafness." Listing 12.00B6. The "paragraph A" criteria for the
24   listing associated with these disorders are "[m]edical documentation of <u>one</u> or more of the
     following: (1) Symptoms of altered voluntary motor or sensory function that are not better
25   explained by another medical or mental disorder; (2) One or more somatic symptoms that are
     distressing, with excessive thoughts, feelings, or behaviors related to the symptoms; or
26   (3) Preoccupation with having or acquiring a serious illness without significant symptoms
     present." Listing 12.07A.
27   [6] When questioned later by B.D.'s counsel regarding the intent behind her use of the word "we,"
     Dr. M. Sherman could not recall using that word, but stated that she was probably referring to her
28   husband Dr. L. Sherman if addressing physical impairments, or to other physicians or medical
     professionals whose notes she was discussing. AR at 172–73.

United States District Court
Northern District of California

> that one can't work if one is constantly going up -- going to
> emergency rooms. That would really -- that is not good. However,
> going to emergency rooms to obtain narcotics, to obtain opiates. So if
> there are no opiates, she certainly can enter the workforce.

*Id.* at 158.

Dr. M. Sherman later clarified that she believed a difference between somatization and malingering was that somatization would include objective findings of an impairment while malingering would not, and concluded:

> Here we feel that whatever the somatization symptoms are for a
> claimant, we wonder what's the cause and -- as Social Security feels,
> if there is drugs on hand or there is a seeking of significant drugs, we
> . . . have to assume that if she stops the opiates, she won't have side
> effects from the opiates and she will not have the somatization
> anymore. . . . Or she can actually be . . . in the workplace. . . . That's
> not -- that's the -- you know, something that all physicians know, that
> certainly, if one is drug seeking, and the drug is -- has side effects, if
> one stopped the drugs, the patient's function will be much different.

*Id.* at 162–63.

Returning to Dr. Quinones's report that B.D. would miss two days of work per month for medical appointments, the ALJ found that "[i]n the absence of substance use, the claimant would no longer have this limitation, as this frequency of medical provider interaction is caused by the claimant's attempts to obtain prescription substances," and that "in the absence of her substance use, the 10% off task limitation would no longer apply, as her reduced concentration is colored by her preoccupation with obtaining prescription narcotics." *Id.* at 36.

The ALJ also suggested that a 2014 report by Dr. Amy Watt, PhD indicated that B.D.'s mental impairments were related to substance use. *Id.* at 27 ("Dr. Watt observed that the claimant had depressed mood, scattered thinking, and impaired concentration and memory, but this was in the setting of a cannabis abuse diagnosis, as the claimant reported using marijuana to her on a regular basis."). Dr. Watt noted that B.D.'s "regular marijuana use" was "of concern" and "may also serve to affect her moods and energy level," but did not offer a firm opinion as to if or how B.D.'s condition would improve if she ceased using marijuana. *Id.* at 1204–05. Other than Dr. M. Sherman's testimony and Dr. Watt's report, the ALJ cited additional evidence of drug use and purported drug-seeking behavior, but did not identify any other evidence that B.D.'s limitations were *caused* by drug use or would differ in the absence of drug use. *See id.* at 27, 31–32, 35–36.

8

1        At an October 23, 2020 administrative hearing, a vocational expert testified that there

2    would be jobs available for someone with the RFC that the ALJ assessed for B.D. except for the

3    limitations of two absences per month and spending ten percent of the workday off task, but that

4    adding *either* of those restrictions, or spending thirty minutes per day off task "all at once," would

5    result in no work available.  AR at 83–86.  The ALJ credited that testimony.  *Id.* at 33–34, 37–38.

6        **C.    The Parties' Arguments**

7            **1.    B.D.'s Motion for Summary Judgment**

8        B.D. contends that the ALJ erred in failing to treat her degenerative disc disease and

9    personality disorder as severe impairments at the second step of his analysis.  Pl.'s Mot. (dkt. 21)

10   at 2–5.  She argues that his RFC assessments are not supported by substantial evidence, for

11   reasons including improperly cherry-picking evidence, failing to give sufficient reasons for

12   disregarding medical opinion testimony, and inadequately tying his analysis to the limitations

13   assessed.  *Id.* at 5–12; *see also id.* at 15–16.

14       Most relevant to the Court's analysis below, B.D. asserts that the ALJ failed satisfy the

15   standards of 20 C.F.R. § 404.1535 and Social Security Ruling ("SSR") 13-2p to evaluate whether

16   substance use—or in the terminology of the regulatory framework, drug addiction and alcoholism

17   ("DAA")—is material to disability.  Pl.'s Mot. at 12–15.  She contends that because Dr. M.

18   Sherman did not find B.D. met a listing or endorse the limitations of attendance and time on task

19   that led the ALJ to find she would be unable to work with her substance use, Dr. M. Sherman's

20   opinions cannot support a finding that those limitations were caused by her substance use.  *Id.* at

21   13–14.  She also argues that the ALJ cited no evidence to support his conclusion "that [B.D.]

22   wouldn't need to miss work for medical appointments if she did not use narcotics and that her

23   '10% of task limitation would not [sic] longer apply as her reduced concentration is colored by her

24   preoccupation with obtaining narcotics.'"  *Id.* at 14 (quoting AR at 36; typographical error in

25   B.D.'s motion).

26       B.D.'s motion "asks the Court to grant summary judgment for [her], reverse the decision of

27   the Commissioner, and remand for further administrative proceedings pursuant to sentence four of

28   42 U.S.C. § 405(g)."  *Id.* at 16.

United States District Court
Northern District of California

9

United States District Court<br>Northern District of California

### 2.    The Commissioner's Motion for Summary Judgment

The Commissioner argues that the ALJ properly found B.D.'s back issues and personality disorder non-severe, and that even if he erred in those determinations at the second step of his analysis, they did not affect his assessment of B.D.'s RFC or his ultimate decision on her application. Def.'s Mot. (dkt. 29) at 4–6. The Commissioner contends that the ALJ properly supported his RFC assessment and gave sufficient reasons for the weight he gave to medical opinion evidence. *Id.* at 6–14.

The Commissioner argues that "the ALJ did a detailed analysis and assessed [B.D.'s] disability under the proper DAA analysis, including SSR 13-2p" and "found that when [B.D.] stopped her substance abuse, she did not have an impairment that met or equaled a Listing, and was not disabled," and asserts that B.D. has not met her burden to refute that analysis or show any harmful error. *Id.* at 14–15. The Commissioner cites no evidence in this portion of her motion supporting the ALJ's conclusion that substance use was material to B.D.'s inability to work. *See id.*

### 3.    B.D.'s Reply

B.D.'s reply delves deeper into her arguments as to why the ALJ erred in rejecting certain medical opinion testimony. Pl.'s Reply (dkt. 33) at 3–13. She reiterates her position that the ALJ erred in failing to recognize B.D.'s degenerative disc disorder and personality disorder as severe impairments. *Id.* at 17–18. She also contends again that the ALJ's findings, including as to the materiality of her substance use, are not supported by substantial evidence, *id.* at 13–17, and that the ALJ erred in failing to correctly apply SSR 13-2p with respect to his conclusion that although B.D. would be unable to work when accounting for limitations caused by substance use, she would be able to work if she ceased such use. *Id.* at 18.

B.D. argues for the first time in her reply that the case should be remanded for an award of benefits, rather than further administrative proceedings, under the Ninth Circuit's "credit-as-true" rule. *Id.* at 18–19.[7]

---

[7] B.D. missed the deadline for her reply and exceeded the page limit without first obtaining an

1    III.    ANALYSIS

2        A.    Legal Standard

3        District courts have jurisdiction to review the final decisions of the Commissioner and may

4    affirm, modify, or reverse the Commissioner's decisions with or without remanding for further

5    hearings.  42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3).

6        When reviewing the Commissioner's decision, the Court takes as conclusive any findings

7    of the Commissioner that are free of legal error and supported by "substantial evidence."

8    Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a

9    conclusion" and that is based on the entire record.  *Richardson v. Perales*, 402 U.S. 389, 401

10    (1971).  "'Substantial evidence' means more than a mere scintilla," *id.*, but "less than a

11    preponderance." *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir.

12    1988) (citation omitted).  Even if the Commissioner's findings are supported by substantial

13    evidence, the decision should be set aside if proper legal standards were not applied when

14    weighing the evidence.  *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978) (quoting *Flake v.*

15    *Gardner*, 399 F.2d 532, 540 (9th Cir. 1978)).  In reviewing the record, the Court must consider

16    both the evidence that supports and the evidence that detracts from the Commissioner's

17    conclusion. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing *Jones v. Heckler*, 760

18    F.2d 993, 995 (9th Cir. 1985)).

19        If the Court identifies defects in the administrative proceeding or the ALJ's conclusion, the

20    Court may remand for further proceedings or a calculation of benefits.  *See Garrison v. Colvin*,

21    759 F.3d 995, 1019–21 (9th Cir. 2014).  "When the ALJ denied benefits and the court finds error,

22    the court ordinarily must remand to the agency for further proceedings before directing an award

23    of benefits." *Leon*, 880 F.3d at 1045 (citing *Treichler*, 775 F.3d at 1099).  "[A]n ALJ's failure to

24    provide sufficiently specific reasons for rejecting the testimony of a claimant or other witness does

25    not, without more, require the reviewing court to credit the testimony as true." *Treichler*, 775 F.3d

26

27    _____

28    extension or permission to file an oversized brief.  The Court granted her motion to consider the
brief despite those violations, but admonished B.D.'s counsel Barbara Mann that future similar
violations of court orders and local rules may result in professional sanctions. *See* dkt. 34.

United States District Court
Northern District of California

1   at 1106.  In appropriate circumstances, however, the court may order immediate award of benefits

2   under the Ninth Circuit's "credit-as-true" rule.  *Leon*, 880 F.3d at 1045 (citing *Garrison*, 759 F.3d

3   at 1019).

4        **B.**    **SSR 13-2p**

5        SSRs "are binding on all components of the Social Security Administration" and

6   "represent precedent[ial] final opinions and orders and statements of policy and interpretations" of

7   the Social Security Administration ("SSA").  20 C.F.R. § 402.35(b)(1); *see also Heckler v.*

8   *Edwards*, 465 U.S. 870, 873 n.3 (1984) (noting the function of SSRs).  "SSRs reflect the official

9   interpretation of the SSA and are entitled to 'some deference as long as they are consistent with

10  the Social Security Act and regulations.'"  *Avenetti v. Barnhart*, 456 F.3d 1122, 1124 (9th Cir.

11  2006) (quoting *Ukolov v. Barnhart*, 420 F.3d 1002, 1005 n.2 (9th Cir. 2005)).  SSRs do not carry

12  the "force of law," but they are binding on the ALJs nonetheless.  *Quang Van Han v. Bowen*, 882

13  F.2d 1453, 1457 n.6 (9th Cir. 1989).  An ALJ's failure to follow an SSR can constitute error

14  requiring remand.  *See, e.g.*, *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1229 (9th Cir.

15  2009).

16       SSR 13-2p sets forth the standard for determining when drug abuse or alcoholism

17  ("DAA") is material to a claimant's mental impairment:

18       *7. What do we do if the claimant's co-occurring mental disorder(s)*
19       *improve in the absence of DAA?*

20       a. Many people with DAA have co-occurring mental disorders; that
    is, a mental disorder(s) diagnosed by an acceptable medical source in
    addition to their DAA. We do not know of any research data that we
21       can use to predict reliably that any given claimant's co-occurring
    mental disorder would improve, or the extent to which it would
22       improve, if the claimant were to stop using drugs or alcohol.

23       b. To support a finding that DAA is material, we must have evidence
    in the case record that establishes that a claimant with a co-occurring
24       mental disorder(s) would not be disabled in the absence of DAA.
    Unlike cases involving physical impairments, we do not permit
25       adjudicators to rely exclusively on medical expertise and the nature
    of a claimant's mental disorder.
26

27       c. We may purchase a CE in a case involving a co-occurring mental
    disorder(s). We will purchase CEs primarily to help establish whether
    a claimant who has no treating source records has a mental disorder(s)
28       in addition to DAA. See Question 8. We will provide a copy of this

United States District Court
Northern District of California

1

evidence, or a summary, to the CE provider.

2

d. We will find that DAA is not material to the determination of disability and allow the claim if the record is fully developed and the evidence does not establish that the claimant's co-occurring mental disorder(s) would improve to the point of nondisability in the absence of DAA.

3

4

5

SSR 13-2p, 2013 WL 621536, at *9 (Feb. 20, 2013). Under SSR 13-2p:

6

Periods of abstinence may be considered evidence of whether DAA is material in cases involving co-occurring mental disorders, so long as the "claimant is abstinent long enough to allow the acute effects of drugs or alcohol abuse to abate." SSR 13-2p(9), 2013 WL 621536, at *12. To find DAA material, there must be evidence demonstrating that any remaining limitations were not disabling during the period. SSR 13-2p(9)(b), 2013 WL 621536, *12.

7

8

9

10

*Wall v. Berryhill*, No. 16-CV-01374-SK, 2017 WL 2901701, at *7 (N.D. Cal. Apr. 24, 2017).

11

"[T]he claimant bears the burden of proving that drug or alcohol addiction is not a

12

contributing factor material to his disability." *Parra v. Astrue*, 481 F.3d 742, 748 (9th Cir. 2007).

13

In *Parra*, the Ninth Circuit found that the plaintiff failed to carry his burden because "[t]he record

14

offered no evidence supporting the notion that the disabling effects of [the plaintiff]'s cirrhosis

15

would have remained had he stopped drinking," and his physician had stated that cirrhosis is

16

generally reversible. *Id.* On the other hand, "there does not have to be evidence from a period of

17

abstinence for the claimant to meet his or her burden of proving disability." SSR 13-2p, 2013 WL

18

621536 at *4. Instead, the determination of whether a claimant's drug or alcohol use is material to

19

disability is based on consideration of "the evidence as a whole, both medical and nonmedical."

20

*Id.*

21

**C.    The ALJ Erred in Evaluating B.D.'s Substance Use**

22

Here, the ALJ appears to have relied on two grounds for his conclusion that B.D.'s

23

substance use was material to her inability to work: (1) the mere fact that she used and sought

24

substances; and (2) Dr. M. Sherman's opinion that B.D.'s depression, anxiety, pain sensitivity, and

25

other symptoms were caused or significantly exacerbated by her opiate and cannabis use. That

26

analysis does not comply with SSR 13-2p.

27

B.D. has co-occurring mental disorders aside from her substance use—as amply

28

documented in the record; as recognized by the ALJ's determination that her depression, anxiety,

United States District Court
Northern District of California

13

United States District Court
Northern District of California

1    and PTSD were severe impairments apart from her substance use, AR at 19; and as reflected in the

2    ALJ's limitation of B.D.'s RFC to low-stress and simple tasks with only occasional interaction

3    with others, even in the version of the RFC he assessed for if she ceased substance use, *id.* at 25.

4            Dr. M. Sherman's testimony—much of which is framed in an unhelpfully euphemistic

5    sense of what "one wonders" based on the medical evidence—indicates that she based her

6    conclusion on her view that "all physicians know, that certainly, if one is drug seeking, and the

7    drug . . . has side effects, if one stopped the drugs, the patient's function will be much different."

8    *Id.* at 163.[8]  While this Court lacks the medical expertise to second guess Dr. M. Sherman's view

9    on its merits, her opinion directly contradicts SSR 13-2p's instruction that the Social Security

10   Administration "do[es] not know of any research data that we can use to predict reliably that any

11   given claimant's co-occurring mental disorder would improve, or the extent to which it would

12   improve, if the claimant were to stop using drugs or alcohol." SSR 13-2p, 2013 WL 621536, at

13   *9.  The ALJ's reliance on Dr. M. Sherman's say-so violates the rule that adjudicators must

14   therefore identify "evidence in the case record that establishes that a claimant with a co-occurring

15   mental disorder(s) would not be disabled in the absence of DAA," and cannot "rely exclusively on

16   medical expertise and the nature of a claimant's mental disorder." *Id.*

17           Assuming for the sake of argument that the ALJ might have been able to find sufficient

18   evidence elsewhere in the record to support his view that B.D.'s frequent medical visits were

19   attributable to drug seeking and would cease in the absence of substance use, he identified no

20   evidence whatsoever to support his view that "her reduced concentration is colored by her

21   preoccupation with obtaining prescription narcotics" and that she would be able to remain on task

22   if she ceased using opiates.[9]  It does not appear that the record reveals any period of abstinence for

---

[8] It is possible that Dr. M. Sherman's written report (to which she alludes in her testimony) included more detailed reasoning as to why she believed B.D.'s limitations were caused by substance use and would not remain significant in the absence of such use.  Even if it did, the ALJ's decision cited only Dr. M. Sherman's oral testimony, not her report, and the Court may not affirm the decision on grounds on which the ALJ did not rely.  *Garrison*, 759 F.3d at 1010. Moreover, neither party has cited or otherwise addressed Dr. M. Sherman's report in their briefs, and it is not the Court's role on summary judgment to "scour the record" for evidence the parties have not raised.  *See Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).

[9] Even if there were evidentiary support for the assertion that B.D.'s inability to remain on task

1    comparison, or other basis to conclude that B.D.'s limitation with respect to time on task would

2    improve in the absence of substance use.  The vocational expert testified that the time on task

3    limitation, in conjunction with the other elements of the RFC that the ALJ did not treat as based on

4    substance use, would be sufficient to render no work available, even without regular absences.

5    AR at 83–86.

6            Accordingly, while there is substantial evidence to the support the ALJ's conclusion that

7    B.D.'s impairments would cause some amount of time off task (i.e., Dr. Quinones's report, which

8    assessed the limitation and attributed it to a diagnosis of depression, *see* AR at 4393–96, an

9    impairment the ALJ also identified as severe), the ALJ's conclusion that this limitation would

10   cease in the absence of substance use is not supported by any evidence, and thus violates SSR

11   13-2p's requirement that adjudicators "must have evidence in the case record that establishes that

12   a claimant with a co-occurring mental disorder(s) would not be disabled in the absence of DAA."

13   SSR 13-2p, 2013 WL 621536, at *9.  Because the ALJ erred in applying the SSR to determine that

14   B.D. would be able to remain on task in the absence of substance use, and the ALJ would have

15   reached a different outcome if he found that ceasing substance use would not mitigate B.D.'s time

16   off task, the denial of B.D.'s application must be reversed and the case must be remanded for

17   further proceedings.

18           **D.    B.D. Waived Any Argument to Remand for Benefits**

19           B.D. argues for the first time in her reply that the case should be remanded for an award of

20   benefits rather than for further administrative proceedings.  That request directly contradicts her

21   motion, which requested remand for further proceedings.  "As a general rule, courts do not

22   consider arguments raised for the first time on reply."  *Padilla v. City of Richmond*, 509 F. Supp.

23   3d 1168, 1180 (N.D. Cal. 2020) (citing, *e.g.*, *Bazuaye v. INS*, 79 F.3d 118, 120 (9th Cir. 1996)).

24

25   was caused by a "preoccupation with obtaining . . . narcotics," it is not obvious that the
     "preoccupation" would cease if she stopped using opiates after having apparently used them
26   regularly for many years, and the ALJ cites no evidence to support that proposition.  *See* SSR
     13-2p, 2013 WL 621536, at *7 (acknowledging that some impairments caused by substance use
27   cannot be expected to improve in the absence of substance of use, and that ongoing substance use
     is therefore not material to disability based on such impairments).  But the Court does not reach
28   that issue, because the ALJ failed to substantiate even that B.D.'s limitation in time on task was
     based on drug seeking.

1    Enforcing that rule is appropriate in this case, where B.D. specifically requested further

2    proceedings in her motion.  The Commissioner thus had no reason to address in her opposition

3    brief the appropriate outcome if the Court found error, and no occasion to oppose the belated

4    request to remand for an award of benefits.  The Court concludes that B.D. waived any argument

5    for awarding benefits by failing to raise it in her motion and instead requesting further

6    administrative proceedings.

7    **IV.    CONCLUSION**

8         For the reasons discussed above, the Commissioner erred in failing to correctly apply SSR

9    13-2p to evaluate the significance of B.D.'s substance use to her disability.  B.D.'s motion for

10   summary judgment is therefore GRANTED, the Commissioner's motion is DENIED, and the case

11   is REMANDED for further administrative proceedings consistent with this order.

12        Because the error in evaluating substance use is sufficient to require remand and might, on

13   further administrative consideration, result in a determination that B.D. is disabled, the Court does

14   not reach B.D.'s remaining arguments.  The Court notes, however, that the ALJ's decision to

15   discredit at least portions of virtually every treating and examining medical source's opinion in the

16   record, while failing to discuss the appropriate legal standard for doing so, raises serious concerns

17   as to whether the ALJ applied the correct standard—particularly given that B.D.'s application was

18   filed before March 27, 2017 and is therefore subject to the more stringent rules in effect before

19   that date for when an ALJ may reject medical opinion evidence.  If the Commissioner does not

20   find on remand that reevaluation of B.D.'s substance use warrants granting her application, the

21   Commissioner is strongly encouraged to also consider whether the ALJ sufficiently justified the

22   weight he applied to the medical opinion evidence.

23        **IT IS SO ORDERED.**

24   Dated: September 30, 2022

25   _____
     JOSEPH C. SPERO
26   Chief Magistrate Judge

27

28

United States District Court
Northern District of California